Matter of Chittur (2024 NY Slip Op 06566)

Matter of Chittur

2024 NY Slip Op 06566

Decided on December 24, 2024

Appellate Division, Second Department

Per Curiam.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on December 24, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

HECTOR D. LASALLE, P.J.
MARK C. DILLON
COLLEEN D. DUFFY
BETSY BARROS
JOSEPH J. MALTESE, JJ.

2018-13402

[*1]In the Matter of Krishnan S. Chittur, an attorney and counselor-at-law. Grievance Committee for the Ninth Judicial District, petitioner; Krishnan S. Chittur, respondent. (Attorney Registration No. 2060630)

DISCIPLINARY PROCEEDING instituted by the Grievance Committee for the Ninth Judicial District. The respondent was admitted to the Bar at a term of the Appellate Division of the Supreme Court in the Third Judicial Department on April 29, 1986.

Courtny Osterling, White Plains, NY, for petitioner.
Frankfurt Kurnit Klein & Selz P.C., New York, NY (Tyler Maulsby of counsel), for respondent.

PER CURIAM.

OPINION & ORDER
The Grievance Committee for the Ninth Judicial
District served the respondent with a notice of petition dated November 1, 2018, and a verified petition dated November 5, 2018, containing 15 charges of professional misconduct. The respondent served and filed a verified answer dated December 24, 2018. By decision and order on motion dated June 27, 2019, this Court referred the matter to Kevin J. Plunkett, as Special Referee, to hear and report. By decision and order on motion dated February 14, 2020, the Grievance Committee's motion for leave to serve and file a supplemental verified petition was granted in part and denied in part. The Grievance Committee served and filed a notice of supplemental petition dated March 3, 2020, and a verified supplemental petition dated February 27, 2020, containing 6 additional charges, and the respondent served and filed an answer to the supplemental petition dated December 19, 2020. By decision and order on application dated June 24, 2021, the issues raised by the supplemental petition and the respondent's answer to the supplemental petition also were referred to Kevin J. Plunkett, as Special Referee, to hear and report.
The hearing took place over the following dates: April 14, 2021; April 16, 2021; October 6, 2022; and October 7, 2022. Prior to the hearing, the parties stipulated to admit 56 exhibits from the Grievance Committee, 12 exhibits from the respondent, and 1 joint exhibit. The parties also entered into two stipulations, dated April 7, 2021, and October 4, 2022, respectively, which included joint proposed findings of fact for the Special Referee. By stipulation dated May 5, 2023, the parties stipulated to withdraw charge 5 of the petition. In a report dated August 17, 2023, the Special Referee sustained charges 1 through 4, and 7 through 15, and did not sustain charges 6, and 16 through 21. The Grievance Committee now moves to (1) confirm so much of the report of the Special Referee as sustained charges 1 through 4, and 7 through 15; (2) disaffirm so much of the report as did not sustain charges 6, and 16 through 21; and (3) impose such discipline upon the respondent as this Court may deem just and proper. The respondent cross-moves to affirm, in part, [*2]and disaffirm, in part, the report of the Special Referee and, in effect, argues that none of the charges should be sustained. We find that the Special Referee (1) properly sustained charges 1 through 4, 7, 8, 10, and 12 through 15, and (2) should have sustained charges 18 and 21, and those charges are sustained. We also find that the Special Referee properly (1) did not sustain charges 6, 16, 17, 19, and 20, and (2) should not have sustained charges 9 and 11, and those charges are not sustained.
The Petition and the Supplemental Petition 
Charges 1 through 4 are based on the respondent's representation of client Robert Fellows, who is also an attorney, in an action against CitiMortgage entitled Fellows v CitiMortgage . The case was settled for $50,000. After the respondent deposited the funds into his IOLA account, the respondent and Fellows had a fee dispute. The respondent and Fellows had executed a class action retainer agreement, but no class was defined or certified at the time of the settlement and the retainer agreement did not specify how the attorney's fee would be calculated under these circumstances. Fellows demanded $25,000 from the $50,000 settlement, and the respondent offered to pay $5,760. In March 2011, Fellows wrote to the respondent and directed him not to invade the $50,000 settlement funds, and requested information concerning the status of the funds, including where the funds were deposited and the current balance. The respondent did not provide Fellows with such information. By July 8, 2011, before the fee dispute had been resolved, the respondent had disbursed more than $25,000 to himself from the settlement funds. Thereafter, on July 22, 2011, the respondent deposited $9,027 in personal funds into his IOLA account and issued a check to Fellows in the amount of $25,000.
Based on the above, charge 1 alleges that the respondent misappropriated funds belonging to another, where such possession was incident to his practice of law, in violation of rule 1.15(a) of the Rules of Professional Conduct (22 NYCRR 1200.0). Charge 2 alleges that the respondent failed to maintain the disputed funds in escrow until the dispute was resolved, in violation of rule 1.15(b)(4) of the Rules of Professional Conduct. Charge 3 alleges that the respondent failed to comply with a client's reasonable requests for information, in violation of rule 1.4(a)(4) of the Rules of Professional Conduct. Charge 4 alleges that the respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of rule 8.4(c) of the Rules of Professional Conduct, by failing to advise his client that he was not holding the $50,000 settlement in escrow and had already disbursed a portion of the settlement to himself.
Charge 7 alleges that the respondent misappropriated client funds, in violation of rule 1.15(a) of the Rules of Professional Conduct by disbursing funds from his IOLA account on eight separate occasions between October 3, 2014, and December 21, 2016, for clients Marc Clar, Namai Pandit, Rajajai Raghavan, Patricia Ritchie, and Natarajan Venkataram when there were insufficient funds on deposit for these clients. The disbursements ranged in amount from $800 to $11,300.
Charges 8 and 10 are based on the same factual allegations. The respondent entered into an escrow agreement with client Venkataram, which authorized the respondent to make payments on Venkataram's behalf only upon a written request by Venkataram. In October 2008, the respondent made a deposit into his IOLA account in the amount $89,090 relating to Venkataram. For years thereafter, the respondent made deposits and disbursements from his IOLA account relating to Venkataram. On June 30, 2015, an electronic credit in the amount of $25,585 was made into the respondent's IOLA account for Venkataram. The respondent was unaware that this credit related to Venkataram and attributed the funds to another client. Prior to the $25,585 deposit, the respondent's IOLA account balance was $11,612.49, of which $7,500 was related to client Ritchie. After the $25,585 deposit, the respondent disbursed $25,000 to himself on July 13, 2015, and the remaining balance of the IOLA account was $12,197.49. The respondent's ledger, however, indicated that as of September 28, 2015, he should have had $25,034.21 on deposit in his IOLA account for Venkataram. According to the bank statement, the respondent's overall IOLA account balance for that date was $10,197.49.
Based on the above, charge 8 alleges that the respondent misappropriated client funds when he disbursed $25,000 to himself on July 13, 2015, in violation of rule 1.15(a) of the Rules of Professional Conduct. Charge 10 alleges that the respondent failed to make accurate entries of all financial transactions in his records of receipts and disbursements, in violation of rule 1.15(d)(2) of the Rules of Professional Conduct.
Charge 12 alleges that between October 25, 2011, and July 11, 2013, the respondent made six disbursements payable to cash from his IOLA account in the total sum of $9,038.30, in violation of rule 1.15(e) of the Rules of Professional Conduct.
Charge 13 alleges that the respondent commingled personal funds with client funds by depositing $5,000 into his IOLA account, representing in legal fees from client Raghavan, on December 15, 2016, in violation of rule 1.15(a) of the Rules of Professional Conduct.
Charge 14 alleges that the respondent failed to maintain required bookkeeping records for his IOLA account, in violation of rule 1.15(d)(1)(ii) and (viii) of the Rules of Professional Conduct, by failing to maintain deposit slips and records identifying the source of funds deposited into his IOLA account.
Charge 15 alleges that the respondent failed to make his IOLA account records available to the Grievance Committee, in violation of rule 1.15(i) of the Rules of Professional Conduct. Specifically, on September 26, 2017, the Grievance Committee requested that the respondent produce records of all deposits relating to Venkataram made into the IOLA account and bank statements from the initial deposit of Venkataram's funds through the end of February 2017. The respondent informed the Grievance Committee that the initial deposit was more than seven years earlier, that he subsequently had moved his office, and that he no longer had the bank statements or deposit slips dating back to the initial deposit. By letter dated December 5, 2017, the Grievance Committee requested that the respondent produce specified IOLA account records from March 1, 2016, through March 31, 2017. The respondent partially complied with this request.
Charges 18 and 21 are based on the same factual allegations. The respondent was the president and sole stockholder of the law firm Chittur & Associates (hereinafter C & A). Between in or about 2003 and June 2017, C & A employed one associate. Starting in approximately February 2013, the respondent was diagnosed with a life-threatening health problem (kidney failure), which resulted in a significant reduction in the hours that he was able to work. Over a period of several years, daily treatment for his health issues took approximately 12 to 14 hours every night. The respondent was hospitalized several times between 2013 and 2017, including two major surgeries, and he was in the intensive care unit for an extended period of time. The respondent traveled throughout the country seeking treatment and also traveled to India for approximatley three weeks seeking an alternative system of medicine. In or about January 2017, the respondent received a kidney transplant and was intermittently quarantined and at times sedated. In June 2017, the respondent emailed the New York City Civil Court to request extensions on his cases, stating that he was unfamiliar with them due to his hospitalizations and that he needed more time.
On or about May 24, 2016, C & A filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York (hereinafter the Bankruptcy Court). In an affirmation filed with the Bankruptcy Court, the respondent stated that since May 2016, he was largely unable to attend to his office full time and had been out of the office for approximately nine months, resulting in insufficient revenue to meet operating expenses. The respondent stated that he had no resources to litigate C & A's approximately 140 pending cases and that there was no viable option for reorganization. Thus, the respondent had no choice but to seek voluntary dismissal, withdraw C & A's representation in those cases, and dissolve C & A. The respondent indicated that from in or about 2003 to June 2017, C & A employed one associate. Although that associate told the respondent that he was overwhelmed, the respondent did not hire additional staff. On February 13, 2018, the Bankruptcy Court converted the Chapter 11 petition to a Chapter 7 liquidation and appointed a trustee, making it clear to the respondent that the trustee was not representing C & A's clients. The Bankruptcy Court instructed the respondent to assist the trustee in contacting C & A's clients, and the respondent indicated his unwillingness to do so because he had worked enough for free. On or about March 9, 2018, the trustee took physical possession of C & A's office and attempted to contact C & A's existing clients to inform them to seek new representation. The trustee sought multiple court interventions to gain access to C & A's computers because the respondent refused to provide login information, citing his concerns over client confidentiality. On March 30, 2018, the Bankruptcy Court granted the trustee's application to employ a technology consultant.
It was later discovered that the respondent had client email addresses and emails with client information, but did not produce this information to the trustee. On July 6, 2018, the trustee reported that C & A had approximately 187 pending cases, but that she could not locate all of the clients and that not all of the client files were located in C & A's office. The Bankruptcy Court again reminded the respondent of his ethical obligation to notify the clients to retain new counsel. As of March 12, 2019, the respondent did not know whether all of C & A's clients were aware that they were no longer represented by C & A.
Based on the above, charge 18 alleges that the respondent failed to take steps, upon [*3]termination of representation, to avoid foreseeable prejudice to the rights of C & A's clients, including giving reasonable notice to the clients, allowing time for employment of other counsel, delivering to the clients all papers and property to which the clients were entitled, promptly refunding any part of any unearned fees that had been paid in advance, and complying with applicable laws and rules, in violation of rule 1.16(e) of the Rules of Professional Conduct.
Charge 21 alleges that the respondent engaged in conduct prejudicial to the administration of justice by failing to abide by the Bankruptcy Court's instructions and by not fully cooperating with the trustee's efforts to locate client contact information, in violation of rule 8.4(h) of the Rules of Professional Conduct.
The Respondent's Answers 
In his answer to the petition, the respondent admitted to some of the factual allegations, denied some factual allegations, and denied violating any Rules of Professional Conduct. As to charges 1 through 4, the respondent stated that Fellows had retained the respondent to file a lawsuit against CitiMortgage for the wrongful collection of private mortgage insurance in the amount of approximately $1,700. Since the recovery amount was small and involved litigation against a big company, Fellows convinced the respondent to file a class action lawsuit. When CitiMortgage filed a motion to dismiss, the court granted the motion and the respondent appealed. While the appeal was pending, Fellows accepted a confidential settlement offer in the amount of $50,000. The respondent claimed that he was owed more than $200,000 in attorney's fees and expenses. When Fellows demanded $25,000 as his portion of the $50,000 settlement, the respondent asserted that Fellows was attempting to engage in "illegal fee-splitting because Fellows was not co-counsel but only a client." The respondent stated that he had no duty to keep disputed funds in his escrow account because he was not obligated to succumb to Fellow's "extortion by holding the settlement funds hostage."
As to charges 7, 8, and 10, alleging multiple incidents of misappropriation and the respondent's failure to make accurate entries of all financial transactions in his records, the respondent denied the charges because the disbursements at issue were accounting errors and alleged that there were "issues about the reliability of the alleged bank statements." As to charge 12, the respondent admitted that he withdrew cash from his IOLA account but stated that it was a "technical violation" and was not done in bad faith. As to charge 13, alleging that the respondent commingled funds by depositing attorney's fees into his IOLA account, the respondent stated that it was an "error in judgment" and therefore "not violative of the Rules of Professional Conduct."
As to charge 14, the respondent denied the charge, contending that he was not obligated to keep deposit slips when the bank statements already reflected the relevant deposits.
In his answer to the supplemental petition, the respondent denied that C & A was languishing and that client matters were being neglected. Rather, the respondent stated that he was actively handling the clients' cases. The respondent explained that he had law firms prepared to, in effect, purchase the cases from C & A to ensure a smooth transition for his clients, but the trustee had thwarted those deals and then blamed the respondent for conduct prejudicing the clients. Thus, the respondent stated that he "was left with no choice, much against my wishes, but to abandon the cases to [the trustee]." According to the respondent, if another law firm were substituted as counsel, it would provide a seamless transition rather requiring the respondent to file "178 withdrawal motions immediately, which neither [C & A] nor [the respondent] could afford or handle." This would also burden the court and confuse and aggravate the clients, who would then flood the respondent's office with phone calls and emails. The respondent also stated that he did not have the resources to return approximately 178 files to the respective clients.
The respondent denied that he failed to cooperate with the Grievance Committee and blamed the trustee for taking over the C & A's files, rendering the respondent unable to cooperate with the Grievance Committee. The respondent also claimed that it was the trustee's obligation to notify the clients of the status of their cases. The respondent stated that "[i]n sum," he committed "no misconduct whatsoever."
The Hearing and the Hearing Record 
The respondent testified that he was an attorney in India and was admitted to practice law in New York in 1986. After his admission, he worked as a litigator for three law firms in the span of 6 ½ years. In 1993, the respondent opened his own firm, first in Manhattan, and in 2001 or 2002, he opened C & A in Ossining. At the time of the hearing, the respondent was 67 years old and had substantially wound down his law practice such that he had only one client. In 2012, the [*4]respondent was informed that he needed a kidney transplant due to end-stage renal disease. In about 2013 or 2014, the respondent began dialysis at a center three times a week. Each dialysis session would take approximately half a day. After a few months, the respondent arranged to have dialysis at home, which required approximately 14 hours per day, each day, starting at 8:00 p.m. until approximately 10:00 a.m. the following day. The respondent had other health issues, and on January 11, 2017, he received a kidney transplant in India. Immediately thereafter, he was in and out of the hospital due to infections until May 2017.
According to the respondent, the treatments for his kidney disease killed his practice because he spent considerable time obtaining treatment, he did not have the energy to work, and in retrospect, he believed that the medications he was taking affected his memory and attention span. From in or about 2003 or 2004 to in or about 2017 or 2018, the respondent had one associate working at C & A, with no bookkeeper or assistant.
In or about May 2016, due to his medical condition and his unsuccessful attempt to lift a judgment filed against him and/or C & A by the landlord of his Manhattan office, C & A filed for bankruptcy. In or about September or October 2016, the respondent also filed for bankruptcy personally. According to the respondent, while he did not intend to resume the practice of law full time because he was focused on volunteering, he was fighting to maintain his law license because his volunteer work was with the Rotary International, and any findings of misconduct would be "headline news" that would sully the organization. The respondent testified that if he had to resign from this organization, the humanitarian projects on which he was working would "come to an abrupt standstill," resulting in "tremendous damage" to the public, Rotary International, and the respondent personally.
At his examination under oath (hereinafter EUO) before the Grievance Committee, the respondent testified that he essentially used bank statements to track the funds in his IOLA account and that he had no formal process of reconciling his IOLA account. When he received the bank statements, he would discard the deposit slips since the bank statement documented the deposits and there was "too much paper" to keep. According to the respondent, no client had ever complained that he or she had been short changed.
The respondent testified that he did not initially disburse $25,000 from the $50,000 settlement that Fellows had requested because the respondent believed that Fellows was blackmailing the respondent to engage in an improper fee arrangement. According to the respondent, Fellows was entitled to receive only $1,780 of the $50,000 settlement, with the rest belonging to the respondent for attorney's fees. Nevertheless, according to the respondent, after consulting with ethics experts, he determined that Fellows was entitled to the maximum amount of $15,000, so the respondent left approximately $15,000 from the settlement in the IOLA account. Eventually, the respondent agreed to pay Fellows the sum of $25,000. The respondent transferred approximately $9,000 from his personal account to his IOLA account to issue a $25,000 check to Fellows.
Regarding any attorney's fees owed to his clients because C & A was no longer able to represent them, the respondent testified that the clients paid a flat fee to his law firm, C & A, and not him personally. Therefore, he did not owe the clients any funds.
The Special Referee's Report 
In a 35-page report, the Special Referee sustained charges 1 through 4, and 7 through 15, but did not sustain charges 6, and 16 through 21. Based upon the evidence, we find that the Special Referee (1) properly sustained charges 1 through 4, 7, 8, 10, and 12 through 15, and (2) should have sustained charges 18 and 21. We find that the Special Referee (1) properly did not sustain charges 6, 16, 17, 19 and 20, and (2) should not have sustained charges 9 and 11.
As alleged in charge 18, we find that the respondent failed to take steps, upon termination of representation, to avoid foreseeable prejudice to the rights of C & A's clients, including giving reasonable notice to the clients, allowing time for employment of other counsel, delivering to the clients all papers and property to which the clients are entitled, promptly refunding any part of any unearned fees that had been paid in advance, and complying with applicable laws and rules. From at least November 2017, the respondent knew that C & A had "no hope of survival," but the record contains no evidence that the respondent took any actions to notify the approximately 140 to 187 clients that had retained C & A that the firm could no longer represent them. Specifically, in his motion to dismiss the Chapter 11 bankruptcy petition, the respondent submitted an affirmation, dated November 15, 2017, stating that C & A "ha[d] no viable hope of survival." Due to his illness, the [*5]respondent was unable to properly attend to his office, and C & A's revenue had diminished to "a trickle." The respondent further stated that "[a]ll of [C & A's] cases are contingency fee cases and are in various stages of litigation. There is thus, no pending 'account receivable.'" Additionally, the respondent stated that C & A had "no resources to litigate these cases. [C & A] ha[d] no viable option for reorganization plan. Further expenditure of resources would be futile, and a waste. Accordingly, [C & A] ha[d] no choice but to seek a voluntary dismissal, withdraw its appearance from its cases, and dissolve."
On February 13, 2018, the Bankruptcy Court converted C & A's Chapter 11 petition to a Chapter 7 liquidation and appointed a trustee. At this point, the respondent still had access to C & A's office and client files, but still failed to notify the clients that they no longer had representation in their cases. The trustee took physical possession of C & A's office on March 9, 2018. Notably, in his EUO, the respondent admitted that even with the appointment of a trustee, he still had a duty to contact the clients to inform them that C & A was liquidated. Yet, between February 13, 2018, and March 9, 2018, the respondent did not contact the clients to advise them that C & A was no longer able to represent them. The respondent also was unwilling to cooperate with the trustee so that the trustee promptly could notify C & A's clients.
For one client, Filice, the respondent never informed him of C & A's bankruptcy as of May 4, 2018. Filice only became aware of the bankruptcy when he received an email from New York County Civil Court, where the matter was pending, advising that the case had been disposed of, and called the court to inquire about the nature of the disposition.
As to charge 21, we find that there is ample evidence in the record that the respondent engaged in conduct prejudicial to the administration of justice by failing to fully cooperate with the trustee's efforts to locate client contact information. In a letter dated March 5, 2018, to the Honorable Robert D. Drain of the Bankruptcy Court, the trustee's attorney, Salvatore LaMonica, detailed his unsuccessful requests to the respondent to provide contact information for C & A's clients so that the trustee could inform those clients that they needed to retain new counsel.
On March 8, 2018, a hearing was held concerning the respondent's failure to produce a client list for C & A. The trustee and attorney LaMonica made it clear that they were seeking only to inform the clients that they needed to find new counsel, and that if the respondent wished to take over the cases, he should file a substitution of counsel or consent to change attorney. When asked again by the trustee to provide contact information for C & A's clients, the respondent stated that the information was in the individual client files, that he had no compilation or access to any such compilation of client contact information, and that he was unwilling to work for free for the trustee to create such a compilation.
On March 8, 2018, Judge Drain granted the trustee's request to take over C & A's office. When the respondent asked for time to "clear the computer of [his] personal information," the trustee objected as the computer belonged to C & A. On March 9, 2018, the trustee took physical possession of C & A's office and requested that the respondent provide passwords for C & A's computers so that she could perform her duties. In a letter to Judge Drain dated March 19, 2018, LaMonica documented their efforts in requesting that the respondent provide passwords for C & A's computers, advising that an email request was made on March 9, 2018, and that the respondent answered that it was not "necessary" for the trustee to access C & A's computers to obtain client contact information since that information was in the physical case files.
On March 15, 2018, another request was made for C & A's computer passwords. The respondent answered, "you folks dispossessed me humiliatingly, unceremoniously, and with no notice whatsoever. . . . For you to demand anything from me is ironic."
On March 23, 2018, Judge Drain issued an order directing the respondent to "immediately" provide to the trustee the computer passwords and log-in information for all of C & A's computers, including three desktop computers and one laptop computer. On March 25, 2018, the respondent filed a petition for a writ of mandamus/prohibition against Judge Drain and the trustee in the United States District Court for the Southern District of New York, seeking to prohibit Judge Drain from enforcing the March 23, 2018 order, and to prohibit the Bankruptcy Court and its appointees from accessing certain information. The respondent argued that such access would violate a state court order. On March 26, 2018, a hearing was conducted before the District Court, after which, the respondent's petition for a writ of mandamus/prohibition was denied. The respondent still failed to provide the passwords for C & A's computers to the trustee. On March 30, 2018, Judge Drain issued an order authorizing employment of a technology consultant for the trustee [*6]to access C & A's computers.
Based on the above, we find that charges 18 and 21 of the supplemental petition should have been sustained.
By notice of motion and affirmation, the Grievance Committee moves to (1) confirm so much of the report of the Special Referee as sustained charges 1 through 4, and 7 through 15; (2) disaffirm so much of the report as did not sustain charges 6, and 16 through 21; and (3) impose such discipline upon the respondent as this Court may deem just and proper. The Grievance Committee reports that on February 8, 2016, a Letter of Caution was issued to the respondent concerning, inter alia, the respondent's delayed return of a retainer fee for approximately seven years.
The respondent cross-moves to affirm, in part, and disaffirm, in part, the Special Referee's report and, in effect, argues that none of the charges should be sustained. The respondent submits that, at worst, a public censure is appropriate because "[a]ll of the charges . . . stem from a time when Respondent was dying." The respondent argues that because the bank records for his IOLA account are incomplete and lack the indicia of authenticity, the records "are thus unreliable and inadmissible and cannot form the basis of discipline." The respondent further argues that since the trustee took over C & A's office, the respondent should not be held liable for failure to maintain proper bookkeeping records. The escrow-related misconduct was also inadvertent, providing an additional basis why the charges should not be sustained.
The respondent fails to explain how any missing bank records not related to the transactions charged in the petition cause the records to be unreliable. He also fails to appreciate that he had a duty to maintain his IOLA account records and produce them to the Grievance Committee. Rule 1.15(j) of the Rules for Professional Conduct states that "[a] lawyer who does not maintain and keep the accounts and records as specified and required by this Rule, or who does not produce any such records pursuant to this Rule, shall be deemed in violation of these Rules and shall be subject to disciplinary proceedings." The respondent claims that he could not produce his IOLA account records because the trustee took over C & A's office. However, the Grievance Committee repeatedly has requested records for the respondent's IOLA account since March 23, 2017, almost a year before the trustee took over C & A's office. The respondent eventually produced some bank statements in his response dated January 4, 2018. The respondent also admitted at his EUO that the records for his IOLA account, in effect, were just bank statements, with no deposit slips, and that the respondent had no process of reconciling his IOLA account. For the respondent to now shift all of his escrow-related misconduct to the trustee demonstrates his refusal to accept responsibility for his misconduct.
Regarding the disputed Fellows settlement, the misconduct occurred in 2011, approximately one year before the respondent's health deteriorated. The respondent argues that Fellows was entitled to only $1,760 of the $50,000 settlement because that was his actual loss and therefore, the respondent did not commit any misconduct by taking most of the settlement as his fees. The respondent does not explain how he subsequently determined that Fellows was entitled to approximately $15,000 of the $50,000 settlement. Nevertheless, the issue before this Court is not what portion of the settlement Fellows or the respondent were entitled to. The issue before this Court is whether the respondent fulfilled his obligation to maintain disputed funds in his IOLA account as required by rule 1.15(b)(4) of the Rules of Professional Conduct. The respondent admitted that he did not, even after Fellows reminded the respondent of his fiduciary duty to do so.
As to charges 18 and 21 of the supplemental petition, the respondent essentially blames his medical condition and the trustee's takeover of C & A's office for the respondent's inability to comply with the ethical rules. The respondent received his kidney transplant in January 2017. The misconduct underlying charges 18 and 21 occurred after the respondent received his kidney transplant. We find it unpersuasive that the respondent was healthy enough to litigate against the trustee and the Bankruptcy Court, but not healthy enough to comply with his ethical duty to notify C & A's clients that the law firm no longer represented them.
Even though C & A filed for bankruptcy, the respondent still had a fiduciary duty towards the clients who retained C & A. That duty, as stated in charge 18, required the respondent to take steps to avoid foreseeable prejudice to the rights of the clients, including giving reasonable notice to the clients, allowing time for employment of other counsel, delivering to the clients all papers and property to which the clients are entitled, promptly refunding any part of unearned fees paid that had been paid in advance, and complying with applicable laws and rules, as required by rule 1.16(e) of the Rules of Professional Conduct. As discussed above, the respondent had months prior to the Bankruptcy Court's appointment of the trustee to notify C & A's clients that they were going [*7]to be without counsel, and he failed to do so. And because the respondent had a duty to avoid foreseeable prejudice to the clients, he should have assisted the trustee in notifying the clients that they would be without counsel. Instead, the respondent demanded payment to do so, even though he admitted that the appointment of the trustee did not relieve him of his duty to contact C & A's clients.
Findings and Conclusion 
Based on the foregoing, charges 1 through 4, 7, 8, 10, 12 though 15, 18, and 21 are sustained, and charges 6, 9, 11, 16, 17, 19, and 20 are not sustained.
In determining an appropriate measure of discipline, in mitigation we have considered, inter alia, the respondent's health challenges, his significant civic contributions, and evidence of his positive character. We have also considered the respondent's refusal to acknowledge his wrongdoing and take responsibility for his misconduct as serious aggravating factors. Even in the midst of the grievance investigation against him, when he already had admitted during his EUO to, among other things, commingling legal fees with client funds, issuing checks payable to cash from his IOLA account, and failing to maintain the required bookkeeping records for his IOLA account, the respondent declared in a letter to the Bankruptcy Court dated July 15, 2018, that he has "never, ever been accused of an ethical violation by any responsible person."
Under the totality of the circumstances, we find that a two-year suspension is warranted.
LASALLE, P.J., DILLON, DUFFY, BARROS, and MALTESE, JJ., concur.
ORDERED that those branches of the Grievance Committee's motion which are to confirm so much of the Special Referee's report as sustained charges 1 through 4, 7, 8, 10, and 12 through 15, and to disaffirm so much of the Special Referee's report as did not sustain charges 18 and 21 are granted; and it is further,
ORDERED that those branches of the Grievance Committee's motion which are to confirm so much of the Special Referee's report as sustained charges 9 and 11, and to disaffirm so much of the Special Referee's report as did not sustain charges 6, 16, 17, 19, and 20 are denied, and it is further,
ORDERED that those branches of the respondent's cross-motion which are to confirm so much of the Special Referee's report as did not sustain charges 6, 16, 17, 19, and 20, and to disaffirm so much of the Special Referee's report as sustained charges 9 and 11 are granted; and it is further,
ORDERED that those branches of the respondent's cross-motion which are to confirm so much of the Special Referee's report as did not sustain charges 18 and 21, and to disaffirm so much of the Special Referee's report as sustained charges 1 through 4, 7, 8, 10, and 12 through 15 are denied; and it is further,
ORDERED that charges 1 through 4, 7, 8, 10, 12 through 15, 18, and 21 are sustained, and charges 6, 9, 11, 16, 17, 19, and 20 are not sustained; and it is further,
ORDERED that the respondent, Krishnan S. Chittur, is suspended from the practice of law for a period of two years, commencing January 23, 2025, and continuing until further order of this Court. The respondent shall not apply for reinstatement earlier than July 23, 2026. In such application (see 22 NYCRR 1240.16), the respondent shall furnish satisfactory proof that during the period of suspension, he (1) refrained from practicing or attempting to practice law, (2) fully complied with this opinion and order and with the terms and provisions of the rules governing the conduct of disbarred or suspended attorneys (see id. § 1240.15), (3) complied with the applicable continuing legal education requirements of 22 NYCRR 691.11(a), and (4) otherwise properly conducted himself; and it is further,
ORDERED that the respondent, Krishnan S. Chittur, shall comply with the rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15); and it is [*8]further,
ORDERED that pursuant to Judiciary Law § 90, effective immediately, the respondent, Krishnan S. Chittur, shall desist and refrain from (1) practicing law in any form, either as principal or as agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,
ORDERED that if the respondent, Krishnan S. Chittur, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency, and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15(f).
ENTER:
Darrell M. Joseph
Clerk of the Court